# Illinois Official Reports

## Appellate Court

***Sedlacek v. Belmonte Properties, LLC*, 2014 IL App (2d) 130969**

| | |
|---|---|
| Appellate Court Caption | FRANK M. SEDLACEK, JR., Plaintiff-Appellant, v. BELMONTE PROPERTIES, LLC, Defendant and Third-Party Plaintiff-Appellee (Janice Raymond, Karen Raymond, Joshua Raymond, and Rebekah Parker, f/k/a Meyer, Rebekah Raymond, Third-Party Defendants). |
| District & No. | Second District<br>Docket No. 2-13-0969 |
| Filed | August 19, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an action for the injuries plaintiff suffered when a Rottweiler that belonged to the ex-wife of one of defendant's tenants broke through the fence on the leased property and attacked plaintiff while he was walking his dog on a public sidewalk, the trial court properly entered summary judgment for defendant, notwithstanding plaintiff's contention that defendant's alleged promise to repair the fence rendered defendant liable, since defendant's promise arguably applied to the tenant's Labrador, but it did not create a duty to repair the fence to contain the Rottweiler, which the tenants were keeping in violation of the lease, especially when there was no showing that repairs were promised after defendant knew the Rottweiler was on the property. |
| Decision Under Review | Appeal from the Circuit Court of McHenry County, No. 12-LA-222; the Hon. Thomas A. Meyer, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on Appeal

Michael E. Coppedge, of Cowlin, Naughton, Curran & Coppedge, of Crystal Lake, for appellant.

Douglas J. Esp and Laura M. Maul, both of Esp Kreuzer Cores LLP, of Wheaton, for appellee.

Panel

JUSTICE McLAREN delivered the judgment of the court, with opinion.
Justices Zenoff and Spence concurred in the judgment and opinion.

**OPINION**

¶ 1    Plaintiff, Frank M. Sedlacek, Jr., appeals the trial court's grant of summary judgment in favor of defendant, Belmonte Properties, LLC. Plaintiff sued defendant after he was injured by a dog kept by defendant's tenants. The injury occurred off of the leased property. We determine that defendant did not owe a duty to plaintiff. Accordingly, we affirm.

¶ 2                                    I. BACKGROUND

¶ 3    On May 2, 2011, plaintiff was walking his dog on a public sidewalk in Crystal Lake. A Rottweiler came running from the backyard of a home rented by Joshua, Karen, and Janice Raymond, broke through the fence, and injured plaintiff. The Rottweiler was owned by Rebekah Parker, Joshua's ex-wife. Plaintiff filed suit against defendant, the Raymonds' landlord, which later filed a third-party complaint for contribution against the Raymonds and Parker. Defendant then moved for summary judgment against plaintiff.

¶ 4    Evidence presented in support of the summary judgment motion showed that Joshua and Karen had lived at the property since 2008. Janice moved into the home in 2010. When Joshua and Karen moved into the home, they signed a lease with a pet policy. The policy stated that all pets "must be restrained by a leash when in the common areas or on the grounds unless there is agreement among tenants that the pet is allowed in the common areas of the property." However, the policy expressly prohibited "[a]ggressive dog breeds." The policy also placed responsibility on the Raymonds for any damages caused by a pet and required them to hold harmless and otherwise release defendant from any liability, judgments, or claims for any injury caused by any pet or animal brought onto the property by the Raymonds. A pet addendum to the lease gave permission for the Raymonds to keep their own dog, a Labrador, on the property. It did not mention the Rottweiler, which they were not yet keeping. The undisputed evidence was that the Labrador was obedient and friendly.

¶ 5    Joshua maintained the outside of the property by mowing the lawn, shoveling snow, and making some repairs to windows. Joshua testified at his deposition that, when he moved into the property, the latch on the gate was rusted and would not go up or down. He said that he discussed the condition of the gate with Kathy and Dean Belmonte, representatives of

defendant, on multiple occasions and that they said that they would fix the gate. However, they never did so. Joshua said that, when the Raymonds moved in, defendant explained that, if their Labrador got out and bit anyone, the Raymonds would be responsible. According to Joshua, "that's when we did bring up the corner of the gate, and [Kathy] said she would get someone out there to fix it." Janice testified that they made multiple requests to fix the gate and that they were concerned in part because there would be three children living there. Kathy testified at her deposition that the Raymonds never complained about the gate and that she never made any representations that she would fix or replace the gate.

¶ 6      According to Joshua, eventually "[t]he lower left-hand side" of the gate "was completely broken off and just hanging there," and the latch was not working properly. Joshua attached a bungee cord to the gate to secure it and required someone to be in the yard with the Rottweiler to supervise it. After the incident, Officer James Harris investigated. From what he could recall, the gate looked all right. Another officer, who had investigated a March 2011 incident in which the Rottweiler bit a person, testified that the gate had a working latch.

¶ 7      Joshua initially agreed to watch the Rottweiler for a couple of weeks for Rebekah, but the dog ended up staying there for several months. He did not notify defendant that the dog was going to be there. About two weeks before the present incident, Dean stopped by the property to inquire about rent. According to Joshua, Dean told him to get rid of the dog or move out, and Joshua told Dean that the gate needed to be fixed and that he was working on getting the dog out. Dean testified that he saw the Rottweiler on the property and was afraid that the dog was going to break through the window to get to him. Based on his observation of it, he believed that it was vicious and aggressive. Dean spoke with Janice, who expressed concern about the safety of children around the dog. Dean informed her that the Rottweiler had to go. Later that afternoon, Dean called Karen and told her that the dog had to go. He did not check back to confirm that the dog was actually removed from the property, because he felt that he had assurances that the Raymonds were going to get rid of the dog. Dean and Kathy did not learn about plaintiff's injury until June 2011, when plaintiff sent them a letter about it.

¶ 8      Applying the First District case of *Solorio v. Rodriguez*, 2013 IL App (1st) 121282, the trial court granted defendant's motion for summary judgment. The court noted that defendant told the Raymonds to remove the Rottweiler and that the injury was caused by the dog, not by the condition of the gate. The court dismissed the action, including the third-party complaint, and plaintiff appeals.

¶ 9                                 II. ANALYSIS

¶ 10      Plaintiff contends that defendant owed him a duty because Dean and Kathy knew that the dog was dangerous, promised to fix the fence, and then failed to do so. Plaintiff then contends that defendant's failure to repair the gate and failure to ensure that the dog was removed from the property were a proximate cause of his injury.

¶ 11      "In a negligence action, the plaintiff must provide sufficient facts showing the existence of a duty owed by the defendant, a breach of that duty, and an injury proximately resulting from the breach." *Klitzka v. Hellios*, 348 Ill. App. 3d 594, 596 (2004). "Where the plaintiff fails to provide facts 'from which the court could infer the existence of a duty,' summary judgment for the defendant is appropriate." *Id.* (quoting *Vesey v. Chicago Housing Authority*, 145 Ill. 2d 404, 411 (1991)). "The existence of a duty is a question of law to be determined

by the court." *Id*. "In all appeals from the entry of summary judgment, we conduct a *de novo* review of the evidence in the record." *Id*. at 596-97.

¶ 12 "Summary judgment is appropriate where the pleadings, affidavits, depositions, and admissions on file, when viewed in the light most favorable to the nonmoving party, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." *Id*. at 597. " 'Summary judgment is a drastic means of resolving litigation and should be allowed only when the right of the moving party is clear and free from doubt.' " *Id*. (quoting *Bier v. Leanna Lakeside Property Ass'n*, 305 Ill. App. 3d 45, 50 (1999)). Therefore, where reasonable persons could draw different inferences from the undisputed material facts or where there is a dispute as to a material fact, summary judgment should be denied. *Id*.

¶ 13 In regard to injuries that occur on leased property, under common law, where the landlord retains control of a portion of the leased premises, the landlord has a duty, as the party in control, to use ordinary care in maintaining that part of the premises in a reasonably safe condition. *Id*. "Conversely, it is well settled in Illinois that a landlord is not liable for injuries caused by a dangerous or defective condition on the premises leased to a tenant and under the tenant's control." *Id*. "Therefore, a lessor who relinquishes control of property to a lessee owes no duty to a third party who is injured while on the leased property. The landlord's liability for the leased premises is extinguished because the lessee acquires an estate in the land and temporarily becomes both owner and occupier, subject to all of the responsibilities of one in possession to those who enter upon the land and those outside of its boundaries." *Id.*

¶ 14 "Several exceptions to the rule permit a third party to recover damages from a landlord who does not control the premises on which the injury occurred: (1) a latent defect exists at the time of the leasing that the landlord should know about; (2) the landlord fraudulently conceals a dangerous condition; (3) the defect causing the harm amounts to a nuisance; (4) the landlord makes a promise at the time of the leasing to repair a condition; (5) the landlord violates a statutory requirement of which a tenant is in the class designated to be protected by such requirement (*Yacoub v. Chicago Park District*, 248 Ill. App. 3d 958, 960 (1993)); and (6) the landlord voluntarily undertakes to render a service (*McCoy v. Chicago Housing Authority*, 333 Ill. App. 3d 305, 309 (2002))." *Id*. at 598.

¶ 15 Most cases discussing the liability of a landlord to a third party for injuries caused by a tenant's animal address injuries on the leased property. One California case would allow for recovery when the landlord had the right to terminate the lease and knew that the animal had vicious tendencies. *Uccello v. Laudenslayer*, 118 Cal. Rptr. 741 (Cal. Ct. App. 1975). However, that case has been widely disagreed with, including by this court. *Klitzka*, 348 Ill. App. 3d at 600.

¶ 16 In *Uccello*, a tenant's invitee sued the landlord for negligently failing to prevent the tenant's dog from attacking her. The California Court of Appeal noted that a landlord may be held liable when "the landlord retains or acquires a recognizable degree of control over the dangerous condition with a concomitant right and power to obviate the condition and prevent the injury." *Uccello*, 118 Cal. Rptr. at 746. The court then noted that the landlord could have threatened to terminate the month-to-month tenancy as a means of coercing the tenant to remove the animal or yield possession of the premises. Thus, the landlord's right to terminate the lease gave him such control over the premises that he owed a duty to protect the invitee

from the tenant's dog. *Id.* at 746-47. There also was no dispute that the landlord actually knew that the dog had a vicious temperament and had previously bitten other people. Thus, the court held that "a duty of care arises when the landlord has actual knowledge of the presence of the dangerous animal and when he has the right to remove the animal by retaking possession of the premises." *Id.* at 743. The court stated that, because "enlightened public policy" dictated that "a moral blame attached to [the] landlord's conduct," a contrary result would be "socially and legally unacceptable." *Id.* at 746-47.

¶ 17　　In *Klitzka*, we disagreed with *Uccello*. The plaintiff, Alexus, lived with her parents next door to the tenants of Michael and Trudy Hellios (the landlords). Alexus was injured on the leased premises when she was bitten by the tenants' dog, and she brought suit against both the tenants and the landlords. She alleged that the landlords were negligent for allowing the dog to remain on the property when they knew or should have known that the dog was dangerous. The tenants said that the dog had never before displayed vicious tendencies except in a few altercations with other dogs. Alexus's parents, however, claimed that they had avoided the dog before the incident because it would frequently growl and bark at people who passed by the yard. The trial court granted summary judgment for the landlords, and Alexus appealed, arguing that the landlords should have known that the dog was dangerous because they "observed the dog barking while it was chained in the front yard and therefore had sufficient notice of its vicious propensities toward children." *Klitzka*, 348 Ill. App. 3d at 601.

¶ 18　　Discussing *Uccello*, we observed that courts in other jurisdictions had rejected its reasoning. In particular, we stated that "our decision to decline to impose vicarious liability upon a landlord for a tenant's dangerous animal 'promotes the salutary policy of placing responsibility where it belongs, rather than fostering a search for a defendant whose affluence is more apparent than his culpability.' " *Id.* at 600 (quoting *Clemmons v. Fidler*, 791 P.2d 257, 260 (Wash. Ct. App. 1990)). Moreover, we observed that holding landlords liable unless they evicted tenants with dangerous dogs would merely result in tenants moving to other locations with their still-dangerous animals. *Id.* Thus, "the public policy concerns raised by the *Uccello* court are not served by imposing liability upon landlords in these cases because such a rule leads to the relocation, not elimination, of the danger the animal presents." *Id.*

¶ 19　　We then held that, even if *Uccello* were followed, the landlords were entitled to summary judgment because there was no evidence of specific occurrences in which the dog bit or even growled at children before the present incident. *Id.* at 600-01. Thus, Alexus had failed to present evidence to show that the landlords knew or should have known that the dog was a danger to children. *Id.* at 601. We further held that a landlord owes no duty to a tenant's invitee to prevent injuries proximately caused by an animal kept by the tenant on the leased premises if the landlord does not retain control over the area where the injury occurred. *Id.*

¶ 20　　In *Solorio*, the First District addressed whether a landlord could be liable for an injury caused by an animal off of the leased property. There, a dog owned by a tenant escaped through a broken gate and bit the plaintiff, who was sitting on the steps of his home next door. The plaintiff filed suit against multiple parties, including the landlord. The tenant had signed a lease prohibiting pets. Before the dog bit the plaintiff, the landlord told the tenant to remove the dog because it was tearing up the basement. After the incident, the landlord again told the tenant to remove the dog. The landlord had authority to repair the broken gate, but

was not aware that it was broken. The trial court found that the landlord did not owe a duty to the plaintiff and granted the landlord's motion to dismiss.

¶ 21 On appeal, the court addressed the issue of "whether a landlord owes a duty to protect third parties from injury inflicted by the tenant's dog when that injury occurs away from the leased premises." *Solorio*, 2013 IL App (1st) 121282, ¶ 18. The court began with the well-accepted rule that "absent evidence of a dog's vicious propensities, the dog is presumed to be tame, docile, and harmless." *Id.* ¶ 19; see *Goennenwein v. Rasof*, 296 Ill. App. 3d 650, 654 (1998). "Therefore, in a negligence action based on a dog-biting incident, to show the defendant owed a duty to the plaintiff, the plaintiff needs to show that the defendant knew or had reason to know the dog would be dangerous ***." *Solorio*, 2013 IL App (1st) 121282, ¶ 19.

¶ 22 Applying *Klitzka*, the court concluded that there was no duty because there was no evidence that the landlord knew or should have known that the dog was dangerous. The court noted that knowledge that the dog was tearing up the basement did not constitute knowledge of a danger to people. The court then further noted that the landlord did not have control over the area. The court observed that, although Illinois case law did not directly answer the issue, "a number of cases from other jurisdictions suggest that, generally, landlords are not responsible for injuries caused by a tenant's dog away from the leased premises." *Id.* ¶ 24 (citing *Kimbrough v. Keenum*, 68 So. 3d 738 (Miss. Ct. App. 2011), *Feister v. Bosack*, 497 N.W.2d 522 (Mich. Ct. App. 1993), and *Fernandez v. Marks*, 642 P.2d 542 (Haw. Ct. App. 1982)). Those cases represent a majority view that, when a dog attack occurs outside of the leased property, beyond the landlord's ownership and control, the landlord does not owe a duty of reasonable care to the plaintiff and any questions of fact as to whether the landlord had knowledge of the dog's dangerous propensities are moot. See *id.* ¶ 25; *Kimbrough*, 68 So. 3d at 740 (citing cases). Further, courts are generally unwilling to make a landlord an insurer of the public against injuries caused by a tenant's dog off the premises. *Fernandez*, 642 P.2d at 543. The *Solorio* court stated:

> "We believe our decision is in line with the public policy of placing responsibility for injuries occurring off of the leased premises on the owner of the dog in the first instance. Like the court in *Fernandez*, we are unwilling to make a landlord an insurer of the public against injuries caused away from the premises by a tenant's dog. *Fernandez*, 642 P.2d at 544. Similarly, the Second District in *Klitzka* noted that it was promoting a policy of placing responsibility where it belonged by declining to hold the landlord responsible for the acts of a tenant's dangerous animal on the leased property. *Klitzka*, 348 Ill. App. 3d at 600 (citing *Clemmons v. Fidler*, [791 P.2d at 260]). Based on the authority cited above, we decline to extend a landlord's duty to protect third parties from injury caused by a tenant's pet to injuries that occur away from the leased premises." *Solorio*, 2013 IL App (1st) 121282, ¶ 28.

¶ 23 Here, under *Solorio*, defendant did not owe plaintiff a duty, because the attack occurred off of the leased premises. However, plaintiff distinguishes *Solorio* on the evidence that defendant here knew about the damaged gate, made promises to repair it, and failed to do so. Because of that twist of facts, plaintiff argues that the Belmontes, who saw the dog and believed that it was vicious, had a duty to follow through on promises to repair the gate to prevent the attack from occurring. We have been able to find only one case that addresses a nuance such as this in detail and we deem it persuasive as it is from a sister state.

¶ 24    In *Wright v. Schum*, 781 P.2d 1142 (Nev. 1989), the plaintiff was walking on a sidewalk when an escaped dog bit him. The plaintiff sued both the dog's owner and the owner's landlord. The evidence showed that the landlord became aware of the dog when a neighbor, Denise Austin, complained that the dog had escaped on other occasions and attacked her dogs. Austin informed the landlord that the dog was very aggressive and would wedge its head between the boards of the fence in an attempt to break through it. There was also a "Beware of the Dog" sign on the front door of the house. The landlord knew that the front fence gate was broken and would allow the dog to escape from the front yard if it gained access to that area. The landlord told Austin that he would make the tenants get rid of the dog or move out. However, the landlord later agreed that the tenants could stay with the dog, based on their promise that they would at all times keep the dog in the house or on a chain in the yard. The trial court dismissed the action against the landlord.

¶ 25    The Supreme Court of Nevada reversed. *Id*. at 1147. The court began by noting that the landlord could not be held liable based on his status as a landlord, and the court declined to adopt the *Uccello* view on that matter. However, the court noted that the landlord could still be subject to liability under principles of tort law applicable to anyone, if there was evidence to support a finding that the landlord failed to exercise due care to avoid subjecting others to an unreasonable risk of harm. *Id*. at 1143. The court reasoned that the landlord's actions could be viewed as creating an unreasonable risk of harm. *Id*.

¶ 26    First, the landlord knew of the dog's dangerous propensities should it escape. Indeed, the landlord allowed the dog to stay only upon the tenants' promise to keep the dog confined, showing that the landlord knew the danger that the dog presented. Second, the landlord took action to attempt to prevent the problem. Applying the principle that a person who voluntarily undertakes to perform a duty owed to a third person must exercise reasonable care, the court noted that the landlord undertook a duty to protect others from the dog. The landlord went beyond mere acquiescence or a failure to intervene when he took affirmative steps to control the situation by promising Austin that he would do something and threatened to use his powers of eviction. At that point, the landlord assumed the duty or obligation to secure the dog and thus also undertook a duty to exercise reasonable care. *Id*. at 1145-46. Finally, the court found a question for the jury as to whether the landlord exercised reasonable care. The court noted that all involved knew about the broken fence, and it stated that "[t]o think that a dangerous dog could be contained, given this opening in the front yard, by the mere promise of the house occupants to keep the dog in the house is to ignore the nature of most dogs." *Id*. at 1146.

¶ 27    In *Wiseman v. Hallahan*, 945 P.2d 945 (Nev. 1997), a person was injured when she slipped and fell on a city-owned icy sidewalk in front of a hotel. The hotel typically had staff clear the sidewalk, but it had not done so that morning. The plaintiff argued that the hotel had assumed a duty to protect third parties. The court discussed *Wright* and clarified that a landowner may be held liable only if he or she takes affirmative action to assume a duty to protect third persons. *Id*. at 947. The court stated that a landlord does not have a duty to third persons if he or she simply acquiesces to a dangerous condition. *Id*.

¶ 28    The holding in *Wiseman* is in accord with Illinois law on the assumption of a duty. "Under the voluntary-undertaking theory, where a person voluntarily agrees to perform a service necessary for the protection of another person or their property, a duty may be imposed on the party undertaking the service; that party must perform the service in such a

manner as not to increase the risk of harm to the other person who relies on the undertaking. [Citation.] One who is negligent in the undertaking will be held liable for the foreseeable consequences of the act if another suffers harm because they relied on the undertaking." *Claimsone v. Professional Property Management, LLC*, 2011 IL App (2d) 101115, ¶ 21; see also *Frye v. Medicare-Glaser Corp.*, 153 Ill. 2d 26, 32 (1992). Our supreme court has looked to sections 323 to 324A of the Restatement (Second) of Torts (Restatement (Second) of Torts §§ 323 to 324A (1965)) to define the parameters of the theory. *Bell v. Hutsell*, 2011 IL 110724, ¶ 12.

¶ 29    Section 324A provides as follows:

"One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

(a) his failure to exercise reasonable care increases the risk of such harm, or

(b) he has undertaken to perform a duty owed by the other to the third person, or

(c) the harm is suffered because of reliance of the other or the third person upon the undertaking." Restatement (Second) of Torts § 324A (1965).

¶ 30    "The essential element of the voluntary[-]undertaking doctrine is an undertaking, and the duty of care imposed on a defendant is limited to the extent of his undertaking." *Iseberg v. Gross*, 366 Ill. App. 3d 857, 865 (2006); see also *Bell*, 2011 IL 110724, ¶ 12 (the duty of care "is limited to the extent of the undertaking"). Further, the extent of the undertaking is determined by a reasonable assessment of its underlying purpose. See *Bourgonje v. Machev*, 362 Ill. App. 3d 984, 1002 (2005). "The theory is narrowly construed." *Bell*, 2011 IL 110724, ¶ 12. For example, a landlord's provision of exterior lighting, absent evidence that it was provided for a specific security purpose, is not a voluntary undertaking to protect tenants from criminal acts. Such lighting may be provided simply for convenience. See *Rowe v. State Bank of Lombard*, 125 Ill. 2d 203, 218-19 (1988). A promise to maintain door locks is also not an assumption of a duty to protect tenants from the criminal acts of third parties. *Sanchez v. Wilmette Real Estate & Management Co.*, 404 Ill. App. 3d 54, 63 (2010). Further, the intent to perform may be abandoned. See *Bell*, 2011 IL 110724, ¶¶ 24, 26. Thus, adults telling teens at a party that alcohol was not to be consumed and that they would monitor the party for alcohol consumption did not undertake to protect the partygoers from harm caused by drunk driving, absent affirmative steps to actually prohibit alcohol possession. To the extent that an inference of such intent could be drawn, the intent to perform the undertaking was abandoned when the adults learned of the alcohol consumption and did nothing. *Id.* ¶ 26.

¶ 31    Here, plaintiff argues that defendant's alleged promises to fix the fence render it liable for his injuries. But defendant's promise did not amount to the undertaking of a duty to protect third parties off the premises from the Rottweiler. As noted, any duty was limited to the extent of the undertaking. See *Bourgonje*, 362 Ill. App. 3d at 1002-03. Although defendant arguably promised to fix the fence in part to contain the Raymonds' friendly Labrador, which under the lease they were authorized to keep, defendant cannot be said to have assumed a duty to contain a dangerous dog that the Raymonds would go on to keep in violation of the lease. Indeed, nothing in the record shows that defendant promised to fix the fence after it knew that the Rottweiler was on the property. Instead, defendant told the Raymonds to get

rid of the dog.[1] Absent a specific promise to fix the fence to contain the Rottweiler, an undertaking to do so cannot be found. Further, to the extent an inference could be drawn that, in 2008, defendant originally intended to fix the fence in order to contain any and all animals, defendant abandoned it when it did not act by the time of the incident in 2011. See *Bell*, 2011 IL 110724, ¶ 24.

¶ 32     Where there was no undertaking of a duty, we will not hold a landlord liable for injuries caused to a third person by a tenant's dog off of the leased property. This view is in line with the case law and the previously stated public policy that landlords will not be held to be insurers of the public against injuries caused away from the premises. Because we determine that there was no duty, we do not address the issue of proximate cause.

¶ 33                                    III. CONCLUSION
¶ 34     Defendant did not owe a duty to plaintiff. Accordingly, the judgment of the circuit court of McHenry County is affirmed.

¶ 35     Affirmed.

---

[1]This, of course, was not a promise or an undertaking to do anything at all about the dog, much less to protect others from it.